# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHAMISO MASWOSWE )
150 W. 225th St. Apt. 25D )
Bronx, NY 10463 )
  )
Plaintiff, )
  )
v. )      Civil Case No.  1:21-cv-411
  )
MONTY WILLIAMS )
ACTING ATTORNEY GENERAL, )
U.S. DEPARTMENT OF JUSTICE )
950 Pennsylvania Avenue NW, )
Washington, DC 20530 )
  )
Defendant. )
--------------------------------------------------------_

## EMPLOYMENT DISCRIMINATION COMPLAINT AND
## DEMAND FOR JURY TRIAL

Plaintiff Shamiso Maswoswe, by and through her undersigned counsel, hereby brings

this civil action against Monty Williams, Acting Attorney General, U.S. Department of Justice

("DOJ" or the "Agency") in his official capacity only, and alleges as follows:

### Introduction and Summary

1. Plaintiff Shamiso Maswoswe is a highly credentialed and accomplished attorney who

worked as a GS-15 Trial Attorney in an elite division of DOJ. She won federal court

trials and received praise for her skills from management and a United States District

Court judge. She is also a Black woman who gave birth to, breastfed, and had

caregiving responsibilities for her baby. Ms. Maswoswe's accomplishments and

commitment to her career were not enough to stave off a termination from her

supervisor, who made her dislike of Ms. Maswoswe's pregnancy, breastfeeding and

child caregiving responsibilities very clear. When Ms. Maswoswe complained about the unequal treatment she received compared to her white, male colleagues, she was terminated immediately thereafter, on the very same day that Ms. Maswoswe secured, and the Defendant celebrated, her major court victory.

2. This Complaint challenges unlawful retaliation, sex, pregnancy, lactation, and race discrimination committed against Plaintiff Shamiso Maswoswe (Ms. Maswoswe) by her managers and supervisors at the Public Integrity Section, a sub-agency within the U.S. Department of Justice, from Ms. Maswoswe's hiring in January 2016 until her termination in November 2017. This lawsuit seeks relief for unlawful retaliation, sex, pregnancy, lactation and race discrimination in violation of Title VII, 42 U.S.C. § 2000e-1 *et seq.* and the Pregnancy Discrimination Act subsumed within it.

## Venue, Jurisdiction and Exhaustion

3. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e-16(c), and the Pregnancy Discrimination Act subsumed within it.

4. Venue lies in this Court pursuant to 42 U.S.C. Sec. 2000e-5(f) and 28 U.S.C. Sec. 1391(b).

5. All statutory prerequisites for bringing this action have been timely satisfied. *See* Exh. 1 (Decision from the U.S. Equal Employment Opportunity Commission (EEOC) Office of Federal Operations (OFO)).

## The Parties

6. Plaintiff Shamiso Maswoswe is an adult resident of New York, who at the time of the events in this Complaint lived in Washington, D.C. and Maryland, and worked for

Defendant in Washington, D.C. She is a Black woman of Zimbabwean descent who became pregnant and gave birth to her child in November 2016, and thereafter breastfed her child. Ms. Maswoswe's child was born premature and with health complications, and she was under doctors' instructions to ensure that her child was fed breast milk.

7.  Defendant, Monty Williams, Acting Attorney General, U.S. Department of Justice ("DOJ" or the "Agency") in his official capacity only, is currently the head of a federal Agency of the United States which hired Ms. Maswoswe in January 2016 and terminated her in December 2017. The Public Integrity Section is an elite sub-division of DOJ whose mission is to oversee the federal effort to combat abuses of the public trust by government officials. The Section investigates and, when warranted, prosecutes, corruption offenses involving public officials at all levels of government.

### Ms. Maswoswe's Background

8.  From January 2016 until her termination in November 2017, Ms. Maswoswe worked as a GS-15 Trial Attorney for the Public Integrity Section. At the beginning of her employment, the Public Integrity Section placed Ms. Maswoswe on a detail to the D.C. U.S. Attorney's Office.

9.  DOJ hired Ms. Maswoswe from her position as Counsel a nationally recognized big law firm in New York City, where she had ten years of experience in white collar criminal matters and complex litigation.

10. Ms. Maswoswe holds a J.D. from New York University Law School ("NYU"), where she received numerous academic awards, including the Baker McKenzie Scholarship, Dean's Merit Scholarship, and the Public Interest Law Scholarship.

11. Throughout Ms. Maswoswe's legal career, she earned multiple awards and honors

including the Rising Star designation by Super Lawyers in 2013-2015 and the Legal Aid

Society's *Pro Bono Publico* Award in 2012, and was recognized by the New York State

Bar Association for her extensive public service.

12.  Ms. Maswoswe holds a Bachelor of Journalism from University of Texas at Austin,

where she received the George Foreman Tribute to LBJ Scholarship, Headliners

Scholarship, Frank Morrow Presidential Scholarship in Business Journalism, Jesse H.

Jones Centennial Scholarship, and the Good Fellow Award.

13.  DOJ actively recruited Ms. Maswoswe to join the Public Integrity Section, and later paid

for Ms. Maswoswe to take a detail to the U.S. Attorney's Office in Washington, D.C. to

gain additional trial practice training.

### Policies Governing Ms. Maswoswe's Employment at DOJ

14.  DOJ is required to follow Title VII of the Civil Rights Act of 1964 and the Pregnancy

Discrimination Act, 42 U.S.C. § 2000e-1, *et seq.* These laws make it unlawful to

discriminate against employees on the basis of their sex, race, pregnancy, and childbirth-

related lactation, and make it unlawful to retaliate for making complaints about any of the

above.

15.  Pursuant to 29 C.F.R. § 1614.102, as a federal agency, DOJ is required to "maintain a

continuing affirmative program to promote equal opportunity and to identify and

eliminate discriminatory practices and policies," "Conduct a continuing campaign to

eradicate every form of prejudice or discrimination from the agency's personnel policies,

practices and working conditions," "Review, evaluate and control managerial and

supervisory performance in such a manner as to insure a continuing affirmative

application and vigorous enforcement of the policy of equal opportunity, and provide

orientation, training and advice to managers and supervisors to assure their understanding and implementation of the equal employment opportunity policy and program" and "Take appropriate disciplinary action against employees who engage in discriminatory practices."

16.   Pursuant to the U.S. Office of Personnel Management ("OPM") Memorandum re Nursing Mothers in Federal Employment, dated December 22, 2010,[1] Federal Agencies "should provide a reasonable amount of break time to express milk as frequently as needed by the nursing mother. The frequency of breaks to express milk as well as the duration of each break will likely vary, according to the needs of the individual mother." In addition, pursuant to OPM, Federal Agencies "are also instructed to develop an agency policy to use current workforce flexibilities to provide reasonable breaks for this purpose."

17.   Pursuant to the NO FEAR Act, 5 C.F.R. § 724 *et. seq.,* DOJ was obligated to affirmatively notify and ensure all employees, including Ms. Maswoswe, that they would not face retaliation for raising complaints of discrimination.

18.   Pursuant to a letter issued by the Attorney General to all Criminal Division Employees at DOJ, "policy of maintaining a work environment that is free from any form of discriminatory harassment," which DOJ defined as "any activity that creates an intimidating, hostile, or offensive work environment, or unreasonably interferes with an individual's work performance, and is related to a person's gender, age, race, color, religion, national origin, disability, gender identity, sexual orientation, status as a parent, or any other impermissible factor. Any conduct constituting discriminatory harassment will not be tolerated." The Memorandum informed employees that the "Criminal

---

[1] *Available at* https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/NMothersFederalEmplymnt.pdf

Division treats all allegations of discriminatory harassment seriously, and will conduct appropriate follow-up and take immediate and appropriate corrective and/or disciplinary action if warranted. In addition, retaliation against persons who make a good-faith report of harassment or participate in investigations of harassment is prohibited and will not be tolerated."

## Plaintiff's Section Chief's Authority and Power at DOJ

19.   DOJ appointed Annalou Tirol, as the then Acting Chief of the Public Integrity Section (hereinafter, "Section Chief"), and she served as Ms. Maswoswe's second-line supervisor. Section Chief Tirol is a woman who at all times relevant to this Complaint did not have any children, and is not African American/Black.

20.   DOJ vested Plaintiff's Section Chief significant authority over employees at the Public Integrity Section, including Ms. Maswoswe. The Section Chief's authority included hiring; firing; promotions; conducting attorney appraisals and evaluations; determining which attorneys received raises, and the amount of any such raises; determining attorney assignments and tasks; assigning attorneys to details; approving attorney requests for training opportunities; managing and approving employee sick leave, maternity leave, and the conditions of such leave; providing attorneys with travel opportunities; determining which attorneys would be beneficiaries of the Public Integrity Section's generous loan repayment program; granting Time-Off Awards; and determining which attorneys would receive a Plaque for Service and Seal from DOJ upon completion of their service.

## Plaintiff's Section Chief's Animus Towards Ms. Maswoswe Upon Learning of her Pregnancy

21. Ms. Maswoswe informed her Section Chief that she was pregnant in or about July 2016.

22. Immediately thereafter, the Section Chief began to treat Ms. Maswoswe worse. The Section Chief would monitor Ms. Maswoswe's bathroom breaks, and frequently demand that Ms. Maswoswe provide details about her pregnancy. The Section Chief did not treat non-pregnant employees in a similar manner.

23. In November 2016, approximately two months before her due date, Ms. Maswoswe's physician put her on medically required bed rest in the hospital, and required her to stay on bed rest until she gave birth.

24. When Ms. Maswoswe informed the Agency that she would be on bedrest, the Agency refused to allow Ms. Maswoswe to utilize the Agency's leave bank policies, claiming that Ms. Maswoswe had missed the deadline to apply for the leave bank. However, the leave bank exists to provide employees facing unexpected health issues with paid leave, and no strict application deadlines apply.

25. Ms. Maswoswe remained on bed rest for approximately three weeks. Even though she was on leave, Ms. Maswoswe remained committed to her caseload and her colleagues at the Public Integrity Section. Ms. Maswoswe corresponded with agents on her cases and held conference calls, as well as answering questions from the Section Chief and her colleagues.

**Ms. Maswoswe's Premature Baby and Doctor's Order to Breastfeed**

26. Ms. Maswoswe gave birth in November 2016. Her baby was born prematurely and with serious health complications, and was placed into the Neonatal Intensive Care Unit (NICU). Ms. Maswoswe remained on maternity leave until March 1, 2017.

27.     Ms. Maswoswe received orders from her doctor that she had to feed her baby breastmilk on account of her baby's premature birth, low birth weight, and health complications.

28.     In preparing to return to work, Ms. Maswoswe made all appropriate arrangements to ensure that she could continue to provide her baby with breastmilk. Ms. Maswoswe arranged for supplies to pump breast milk at work, and to keep the pumped milk refrigerated and fresh until she could feed it to her baby in the evenings.

29.     Ms. Maswoswe also prepared for the fact that she would need to travel as part of her job as a Trial Attorney for the Public Integrity Section. Ms. Maswoswe was aware that it was difficult to pump enough milk to feed a baby for several days in advance, and difficult to ship pumped breast milk while on travel and ensure that it would be fresh upon arrival, and so Ms. Maswoswe made preparations to potentially bring her infant on work travel with her to ensure that she could provide her baby with fresh, safe breastmilk, which her baby's physician had ordered.

30.     In sum, Ms. Maswoswe returned from maternity leave fully committed to taking on the complex work and long hours that her job required as well as to ensure that her baby's medical needs would be taken care of. Ms. Maswoswe expected the Public Integrity Section to support her as she understood to be required by DOJ's own policies and the law, and not make her choose between her career and her baby's health.

**Plaintiff's Section Chief's Animus Towards Ms. Maswoswe After Ms. Maswoswe Gave Birth**

31.     After returning from maternity leave, Plaintiff's Section Chief's treatment of Ms. Maswoswe worsened. While Ms. Maswoswe was committed to working as a Trial Attorney, her supervisor, the Section Chief exhibited a hostility towards her and

repeatedly questioned her ability to perform her job duties given that Ms. Maswoswe had a baby and needed to pump breastmilk during the day.

32.     Plaintiff's Section Chief gave Ms. Maswoswe extra document review and menial assignments while attorneys who had not given birth and were not breastfeeding were given more substantive assignments that were commensurate with a Trial Attorney's position. Document review assignments were usually given to more junior attorneys, and/or spread amongst multiple trial attorneys at the Public Integrity Section. Giving Ms. Maswoswe large document review assignments limited her ability to take on the more advanced legal work that was typically handled by GS-15 Trial Attorneys in the Public Integrity Section. The Section Chief did not assign multiple large document review assignments to attorneys who were not breastfeeding and/or given birth.

33.     Plaintiff's Section Chief told other attorneys in the Public Integrity Section that Ms. Maswoswe required mentorship from attorneys with similar and less experience than Ms. Maswoswe had. The Section Chief did not suggest similar mentoring relationships for attorneys who had not given birth and/or who were not breastfeeding.

34.     Plaintiff's Section Chief continued to monitor Ms. Maswoswe's bathroom breaks and pumping breaks, and consistently questioned Ms. Maswoswe's use of time and ability to handle work projects. Such questioning of Ms. Maswoswe's performance was unfounded and humiliating as she not only met her deadlines, but also produced work product that was considered high quality by senior attorneys at the Public Integrity Section. The Section Chief did not similarly scrutinize attorneys who had not given birth and/or who were not breastfeeding.

35.     Plaintiff's Section Chief made comments that Ms. Maswoswe should not travel so that

she could spend time with "her little one," and would not have to spend an extended period of time away from home and from her baby. However, Ms. Maswoswe was eager to work for the Public Integrity Section and did not wish to be denied work opportunities simply because she had a baby and had to breastfeed.

36.   Plaintiff's Section Chief prevented Ms. Maswoswe from participating in a full two-week trial in North Carolina. The Section Chief stated that she did not believe that Ms. Maswoswe should be travelling for two weeks when she had a baby, and thus insisted that Ms. Maswoswe attend the trial for only one week. Ms. Maswoswe objected to being taken off a substantial part of the trial, which was a valuable professional opportunity for her. In addition, Ms. Maswoswe feared that not being able to attend the entire trial would leave her colleagues in a lurch and also create the impression that she was not available for work assignments because she was a new mother.

37.   Ms. Maswoswe made arrangements to bring her infant to the trial in North Carolina, and have her mother-in-law and sister-in-law stay in the same hotel to care for her infant during the day while Ms. Maswoswe was attending court. This allowed Ms. Maswoswe to breastfeed her baby in the mornings and the evenings, and not risk that any pumped breastmilk would spoil on shipment back to Washington, D.C. Ms. Maswoswe made these arrangements at her own personal expense and with no cost to DOJ. When Plaintiff's Section Chief found out about this arrangement, the Section Chief emailed snide comments about Ms. Maswoswe's decision to both handle a trial and bring her infant: The Section Chief emailed Deputy Chief J.P. Cooney stating "Get this: Shamiso, husband, baby, and mother in law are all going to drive down to the trial. She's actually super excited for the road trip, and she won't be apart from the baby." Deputy Chief

Cooney responded "WTF?"

38.  Ms. Maswoswe's trial in North Carolina was successful, and she garnered praise for her assistance from the lead attorneys on the case. At no point did Ms. Maswoswe's decision to bring her infant to North Carolina interfere with her work for the Public Integrity Section.

39.  Nonetheless, after the trial in North Carolina, Plaintiff's Section Chief stated that she was concerned that Ms. Maswoswe "now couldn't handle" the job anymore. Ms. Maswoswe understood this to be a direct reference to her child birth, breastfeeding, and caregiving obligations.

40.  Plaintiff's Section Chief denied Ms. Maswoswe's requests for training and growth opportunities, such as observing trials, meeting with political figures, observing witness interviews, and important staff meetings. Other attorneys who were not breastfeeding and/or had not given birth were not similarly denied such opportunities.

41.  Plaintiff's Section Chief refused to approve Ms. Maswoswe as a recipient for the Public Integrity Section's generous student loan repayment program, under which the Public Integrity Section pays the attorneys' monthly student loan payment for the duration of employment.

**Ms. Maswoswe's Accomplishments for DOJ**

42.  Despite Plaintiff's Section Chief's heavy scrutiny of her work, and denying her training opportunities, Ms. Maswoswe made major contributions to the Public Integrity Section and its mission. Some examples of Ms. Maswoswe's high performance are included below.

43.  In August 2016 Ms. Maswoswe drafted an indictment which charged a drug trafficking

offense as bribery.  The indictment was unique and was thereafter requested by United States Attorneys' Office across the country for use as a model.

44.     Ms. Maswoswe's work on the North Carolina trial was praised, including her contributions to the trial team during trial and the oppositions to the *motions in limine* that she drafted for the trial.

45.     Ms. Maswoswe also worked on investigating, developing, overseeing, and briefing numerous cases on the Public Integrity Section's docket.

46.     Ms. Maswoswe successfully presented a case to a grand jury, and drafted a successful detention memorandum which was key to the case.

47.     Ms. Maswoswe represented the United States government in numerous status conferences in federal district courts, worked with the U.S. Federal Bureau of Investigations (FBI) to put together an operation, and investigated a new form of scam called Scam PACs.

48.     In July 2017, Ms. Maswoswe second chaired Defendant's successful prosecution of three postal workers in a drug trafficking case.  Ms. Maswoswe played a prominent role in the two week jury trial.  She presented a powerful, compelling opening argument which won praise from both her colleagues as well as reluctant praise from Plaintiff's Section Chief. Ms. Maswoswe additionally handled the direct testimony of key witnesses including an expert witness, a financial analyst and multiple law enforcement officers. The trial was a high profile one for DOJ and resulted in multiple articles including from the Washington Post; television news reports, and press releases from DOJ.  Ms. Maswoswe appeared on television during the coverage of the trial.

49.     Ms. Maswoswe made successful oral arguments on a Federal Rule of Criminal Procedure

Rule 29 argument, which resulted in United States District Judge Tanya Chutkan denying the defendants' motion.

### Ms. Maswoswe Complains of Discrimination

50. Ms. Maswoswe complained about discrimination in the Public Integrity Section to her Section Chief during Ms. Maswoswe' August 28, 2017 annual performance review.

51. Ms. Maswoswe came to the performance review meeting in the wake of winning a major jury trial in D.C. for the Public Integrity Section that garnered media coverage, and receiving high praise from her colleagues for her skill in trial. As such high profile accomplishments were noteworthy at the Public Integrity Section, Ms. Maswoswe expected to receive high performance marks.

52. At the meeting, Plaintiff's Section Chief informed Ms. Maswoswe that the Section Chief was giving her a rating of "Satisfactory."

53. Ms. Maswoswe informed her Section Chief that she thought that the rating did not reflect her performance. Ms. Maswoswe told the Section Chief that she believed the Satisfactory rating was discriminatory given Plaintiff's Section Chief's continuing pattern of treating Ms. Maswoswe worse than other employees who were not pregnant, breastfeeding or had given birth, as well as non-African American employees. Ms. Maswoswe specifically cited the example of one white, male colleague (name withheld to protect his privacy) whom the Section Chief had treated more preferably when he took paternity leave when his wife gave birth than the Section Chief had treated Ms. Maswoswe when she took maternity leave when Ms. Maswoswe herself gave birth.

54. Ms. Maswoswe informed Plaintiff's Section Chief that she intended to challenge the performance review because she believed it was discriminatory.

55.     When Ms. Maswoswe stated that she intended to bring charges of discrimination, her Section Chief asked in a frustrated tone whether Ms. Maswoswe "really wanted" to bring such charges. Ms. Maswoswe understood that the Section Chief did not look kindly upon engaging in such protected activity, and/or did not want Ms. Maswoswe to raise such charges.

56.     After Ms. Maswoswe raised allegations of discrimination, Plaintiff's Section Chief stated "you know Shamiso travelling is a part of this job." Ms. Maswoswe understood that the Section Chief was once again stereotyping Plaintiff as unwilling or unable to do her job because she had an infant and/or was breastfeeding. Ms. Maswoswe reminded her Section Chief that she was committed to the job and the travel that it entailed, and did not want to be held back from professional opportunities simply because she had a baby who required breastfeeding.

57.     Two days later, on August 30, 2017, Ms. Maswoswe contacted Human Resources to officially complain about the performance review she received and the overall discrimination she was experiencing in the Public Integrity Section.

**Plaintiff's Section Chief's Animus Towards Ms. Maswoswe for Taking her Baby on Work Travel with Approval**

58.     On September 6, 2017, Ms. Maswoswe traveled to New Jersey along with many other DOJ attorneys to observe the trial of U.S. Senator Robert Menendez for training purposes only. The attorneys, including Ms. Maswoswe, were there solely to observe the trial, and were all seated in a separate viewing room in the courthouse to watch the trial via live streaming video. At no point were the attorneys from the Public Integrity Section who were not members of the trial team, including Ms. Maswoswe, going to be in the trial court room with the judge, jury, witnesses, and/or counsel.

14

59.   In advance of the trip, Ms. Maswoswe asked her assigned mentor at the Public Integrity

Section if she would be permitted to take her infant to the trial, given that she would be

viewing the trial in a separate room. She received approval. In addition, Ms. Maswoswe

consulted with another senior Trial Attorney at the Public Integrity Section, who

confirmed that this would be appropriate. Ms. Maswoswe went through the designated

DOJ travel authorization approval channels to get the official approval for her plane

ticket to Newark, NJ, including for her infant, and related travel accommodations. All of

her travel was approved by DOJ. Ms. Maswoswe's assigned mentor had actual and/or

apparent authority to approve Ms. Maswoswe's requests regarding traveling with her

infant.

60.   When Plaintiff's Section Chief saw Ms. Maswoswe at the airport with her infant, the

Section Chief quickly contacted Criminal Division's Director of Human Capital Director

and General Counsel in the Criminal Division on September 6, 2017. According to the

Section Chief, this was the date she decided that she would terminate Ms. Maswoswe's

employment with the Public Integrity Section.

61.   Ms. Maswoswe observed the trial from a separate room with her baby without incident.

Ms. Maswoswe say with her baby in the back row, and her baby slept through the trial

and occasionally woke to nurse quietly. Neither attorneys in the separate viewing room

nor the trial team themselves objected to Ms. Maswoswe's sleepy baby's presence. One

of Ms Maswoswe's supervisors was present in the viewing room and never objected to

the presence of and Maswoswe's infant. In addition, the courtroom bailiffs in the viewing

room allowed Ms. Maswoswe and her infant to remain. In fact, an attorney on the trial

team testified that Ms. Maswoswe's baby's presence caused no distraction or disruption

15

to the trial team nor did it adversely affect the performance of the trial team.

62.  Ms. Maswoswe's presence with her baby was especially unlikely to be a cause for concern in the State of New Jersey, where State Law explicitly states that "a mother shall be entitled to breast feed her baby in any location of a place of public accommodation, resort or amusement wherein the mother is otherwise permitted."

63.  At no point did Plaintiff's Section Chief ask Ms. Maswoswe if she had obtained authorization to bring her infant; ask if Ms. Maswoswe could arrange for outside child care while the court was in session like Ms. Maswoswe had done in North Carolina; instruct Ms. Maswoswe that she could not bring her infant with her during work hours; or even give Ms. Maswoswe a warning. Instead, the Section Chief took action to terminate Ms. Maswoswe.

**Termination**

64.  Less than two weeks after Plaintiff's Section Chief gave Ms. Maswoswe a positive "Satisfactory" annual review, and less than one week after Ms. Maswoswe traveled to New Jersey to observe the Menendez trial, the Section Chief officially moved to terminate Ms. Maswoswe.

65.  In a letter dated September 11, 2017, Plaintiff's Section Chief wrote a recommendation to not convert or extend Ms. Maswoswe's Trial Attorney appointment. In the letter, the Section Chief alleged now that Ms. Maswoswe had poor performance and a "poor attitude." As examples, Plaintiff's Section Chief explicitly cited to Ms. Maswoswe "criticiz[ing] a colleague in an effort to demonstrate her own competence." This was a reference to Ms. Maswoswe complaining about the preferential treatment the Section Chief showed to Ms. Maswoswe's white male colleague when his wife gave birth. The

Section Chief also alleged that Ms. Maswoswe "demonstrated a lack of judgment regarding appropriate workplace behavior" because she brought her infant to the trial in New Jersey. No reference was made to whether Ms. Maswoswe obtained permission to bring her baby on this work travel, nor whether there was any actual disruption caused by the baby's presence.

66. On September 12, 2017, the Public Integrity Section informed Ms. Maswoswe that she was being terminated via a letter which stated that the decision at the recommendation of Plaintiff's Section Chief and was "based on [Ms. Maswoswe's] performance and conduct as an attorney with the Public Integrity Section."

67. The Public Integrity Section terminated Ms. Maswoswe on the same day that she completed a successful sentencing hearing in the aftermath of her large and highly publicized jury trial victory. United States District Judge Tanya Chutkan had complimented Ms. Maswoswe's trial skills in open court on that same day, and Ms. Maswoswe and her colleagues at the Public Integrity Section were celebrating her victory when she received notice that she was being summoned to meet with Human Resources, where DOJ terminated here.

**The Public Integrity Section Intended to Keep Ms. Maswoswe at DOJ Before She Complained About Discrimination**

68. The Public Integrity Section Intended to keep Ms. Maswoswe employed as a Trial Attorney before she complained about discrimination.

69. Plaintiff's Section Chief drafted Ms. Maswoswe's written performance review prior to Ms. Maswoswe's in-person performance review meeting. The Section Chief presented Ms. Maswoswe with the pre-written performance review at their annual performance review meeting held on August 28, 2017.

70.   Plaintiff's Section Chief gave Ms. Maswoswe a positive rating of "Satisfactory." The Public Integrity Section's own review documents define "Satisfactory" as "Consistently performs all major requirements satisfactorily; accomplishes all objectives; occasionally exceeds the expectations of the major job functions."

71.   The performance review documents outline in detail that in order to achieve a "Satisfactory" rating, attorneys such as Ms. Maswoswe must produce work that is correct, appropriate, effective, and high quality. The review documents require that the employee must "**consistently meet ALL**" of the expectations laid out. *Id.* (emphasis in original). The Section Chief personally signed off that Ms. Maswoswe had met these high performance standard criteria.

72.   Ms. Maswoswe's rating was a positive rating that was given to all of Ms. Maswoswe's comparators, and "was entirely consistent with ratings received by other new attorneys in the section." Plaintiff's Section Chief testified that this rating "was consistent with other new attorneys in the section."

73.   In the review, Plaintiff's Section Chief wrote that "[w]e look forward to Shamiso completing that investigation and presenting an indictment in the next rating period" and "we look forward to her moving those [other matters assigned] towards appropriate resolutions in the next period." The review concludes with Plaintiff's Section Chief stating her goals for Ms. Maswoswe in the next year and that "[w]e look forward to Shamiso's continued professional development." *Id.*

74.   In sum, the Agency's own evaluation of Ms. Maswoswe as of August 28, 2017 shows that the Agency intended to retain Ms. Maswoswe and continue giving her assignments and professional development opportunities.

75.  The Public Integrity Section did not terminate any other attorneys who received the same performance rating as Ms. Maswoswe.

76.  Ms. Maswoswe was the only attorney in the Public Integrity Section to be terminated at the end of her initial appointment.

77.  The Public Integrity Section has never provided an explanation of why Plaintiff's Section Chief went from giving Ms. Maswoswe a positive performance review that expressed intent to keep Ms. Maswoswe employed to terminating Plaintiff in the span of two weeks.

### Related Discrimination at the Public Integrity Section

78.  Upon information and belief, other women have been forced out of the Public Integrity Section and/or denied opportunities and promotions when they become pregnant. Women attorneys believe that they will not advance to senior positions if they have a family.

79.  Upon information and belief, employees at the Public Integrity Section have observed that a disproportionate number of people who become mothers, and then immediately leave because of the way they are treated by the Public Integrity Section management. One attorney asked management if there were any women who had kept their jobs at the Public Integrity Section after giving birth, and management could not provide one name.

80.  Upon information and belief, other attorneys have complained about the Public Integrity Section's failure to provide them with breastfeeding and breast pumping accommodations, and have experienced retaliation for requesting these accommodations. One attorney complained about the Public Integrity Section's practice of "hazing" new mothers by denying them breastfeeding accommodations, and harshly scrutinizing them.

81.  The Public Integrity Section management has made comments such as that an attorney is "a great prosecutor, but she's made the decision to be a mom" in reference to an attorney

who left the Public Integrity Section after giving birth. The Public Integrity Section

management has also made reference to the idea that it "makes sense" for women to

leave after giving birth.

82.    Upon information and belief, the Public Integrity Section has a history of promoting

white men over women and minorities. Plaintiff's Section Chief denied the promotion of

a Black woman (name withheld for privacy reasons) three times. Plaintiff's Section Chief

denied the promotion of a Hispanic woman (name withheld for privacy reasons) twice.

83.    When Ms. Maswoswe was hired, Deputy Assistant Attorney General (DAAG) Ray

Hulser, a senior manager in the Public Integrity Section, commented that he had never

"hired anyone like her before" and then commented that he had because they had a

second Black female attorney.

84.    DAAG Hulser routinely made sexist comments in the workplace, such as using the

phrase "pussy" as a slur.

**<u>Ongoing Retaliation and Impact of the Termination</u>**

85.    DOJ's discriminatory termination of Ms. Maswoswe's employment has inflicted

enormous financial, reputational, personal and emotional harm on her.

86.    After her termination, Ms. Maswoswe diligently sought new employment, but due to her

unceremonious termination from the Public Integrity Section, it was difficult to obtain.

Ms. Maswoswe did not find new employment for many months. The job she ultimately

found pays less than her job at the Public Integrity Section and does not provide the same

benefits. Ms. Maswoswe experiences ongoing and continuous harm from Public Integrity

Section's decision to terminate her.

87.    Even after Ms. Maswoswe's termination, her former Section Chief continued to retaliate

against her by blocking her employment with negative references. In one instance, Ms. Maswoswe had a successful job interview, but the interviewer insisted that no offer could be made until they spoke to Ms. Maswoswe's former supervisor, her Section Chief at the Public Integrity Section. After the interviewer spoke to the Section Chief, Ms. Maswoswe received news that she would not be offered the job. Ms. Maswoswe believes that she did not receive the job due to a discriminatory and retaliatory negative review provided by the Section Chief.

## **STATEMENT OF CLAIMS**

### **Count I: Retaliation**

88.  Plaintiff incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

89.  Retaliation because of an employee's complaints of discrimination is unlawful under Title VII, 42 U.S.C. § 2000e-1 *et seq.*, and the Pregnancy Discrimination Act subsumed within it.

90.  Defendant qualifies as an employer under Title VII, and thus, Defendant has a legal obligation to provide Plaintiff and all employees a workplace free of unlawful discrimination and retaliation and to investigate and then to remedy the situation if discrimination occurs.

91.  On August 28, 2017, citing her lower than expected performance rating among other things, Plaintiff notified her Section Chief (Ms. Tirol), that she believed she was being discriminated against compared to her male colleagues and childless colleagues, and because she was a breastfeeding mother. Plaintiff informed her Section Chief on that day that Plaintiff intended to file a complaint of discrimination.

92.    On August 30, 2017, Plaintiff formally contacted the Defendant's Human Resources department and filed a complaint of discrimination.

93.    On September 6, 2017 (or possibly as early as August 28, 2017) the Defendant decided to terminate Plaintiff. On September 11, 2017, Plaintiff's Section Chief wrote a memorandum recommending Plaintiff's termination, and on September 12, 2017, Defendant terminated Plaintiff based on Plaintiff's Section Chief's recommendation.

94.    Defendant explicitly cited Plaintiff's complaint of discrimination in the memorandum recommending her termination. In addition, sworn testimony from Plaintiff's Section Chief to an investigator shows that the Section Chief was aware of Plaintiff's complaints of discrimination and that these were part of the basis for the termination.

95.    The above cited statements by Plaintiff's Section Chief (Ms. Tirol) constitute direct evidence of unlawful retaliation.

96.    Defendant has provided no legitimate, non-discriminatory reason for its sudden decision to terminate Plaintiff directly after she received a positive "Satisfactory" annual performance review.

97.    Defendant has continued to retaliate against Plaintiff by providing negative references which have impeded Plaintiff's efforts to obtain new employment and comparable income and benefits to what she had earned during her employment for Defendant.

## Count II: Discrimination Based On Sex/Caregiver Status

98.    Plaintiff incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

99.    Discrimination because of an employee's sex and stereotyping employees based on their sex/caregiver status, and stereotypes about women's ability to and/or commitment to their

jobs on account of having children is unlawful under Title VII, 42 U.S.C. § 2000e-1 *et seq.*

100.  Defendant qualifies as an employer under Title VII, and thus, Defendant has a legal obligation to provide Plaintiff and all employees a workplace free of unlawful discrimination and to investigate and then to remedy the situation if discrimination occurs.

101.  Plaintiff Shamiso Maswoswe is a woman and a mother who had caregiving responsibilities for her infant, especially because her infant was born premature, needed additional care and required breast milk according to doctor's orders.

102.  Defendant treated Plaintiff worse than men who were fathers and had child caregiver responsibilities.

103.  Defendant treated Plaintiff worse than both men and women without child caregiving responsibilities.

104.  Defendant has a known history of pushing women out of the Public Integrity Section when they become pregnant and/or give birth. Defendant has a known history of making comments evidencing that Defendant does not believe motherhood and a job as an attorney for Defendant are compatible.

105.  Defendant stereotyped Plaintiff as unavailable for, and insufficiently committed to her work as a Trial Attorney in the Public Integrity Section because she was a mother with caregiving responsibilities. Defendant did so despite the long hours Plaintiff worked, and the high level of performance Plaintiff exhibited.

106.  Defendant fired Plaintiff because she publicly engaged in child caregiving activity, namely bringing her infant on work travel (with approval), and cited this as one of the reasons for terminating Plaintiff.

107.   Defendant's citing child caregiving as a reason for an employee's termination constitutes direct evidence of unlawful discrimination.

## Count III: Discrimination Based on Pregnancy and Childbirth

108.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth in this Count.

109.   Discrimination because of an employee's pregnancy and/or childbirth is unlawful under Title VII, 42 U.S.C. § 2000e-1 *et seq.*, and the Pregnancy Discrimination Act subsumed within it.

110.   Defendant qualifies as an employer under Title VII, and thus, Defendant has a legal obligation to provide Plaintiff and all employees a workplace free of unlawful discrimination and to investigate and then to remedy the situation if discrimination occurs.

111.   Plaintiff, Shamiso Maswoswe, is a woman who was pregnant and gave birth in November 2016, and is accordingly a member of a class of persons protected by Title VII, which prohibits discrimination against individuals on the basis of their pregnancy and childbirth.

112.   Defendant qualifies as an employer under Title VII, and thus, Defendant has a legal obligation to provide Plaintiff and all employees a workplace free of unlawful discrimination and to investigate and then to remedy the situation if discrimination occurs.

113.   Defendant mistreated Plaintiff upon learning of her pregnancy, denied her professional opportunities, and treated her as unable or unwilling to do her job because of her pregnancy and childbirth. Ultimately, Defendant fired Plaintiff because of her status as a woman who was pregnant and gave birth.

## Count IV: Discrimination Based On Lactation

114.    Plaintiff incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

115.    Discrimination because of an employee's childbirth-related lactation is unlawful under Title VII, 42 U.S.C. § 2000e-1 *et seq.* and the Pregnancy Discrimination Act subsumed within it.

116.    Defendant qualifies as an employer under Title VII, and thus, Defendant has a legal obligation to provide Plaintiff and all employees a workplace free of unlawful discrimination and to investigate and then to remedy the situation if discrimination occurs.

117.    Defendant mistreated Plaintiff  because she was lactating, denied her professional opportunities, and treated her as unable or unwilling to do her job because of her status as a lactating mother. Ultimately, Defendant fired Plaintiff because of her status as a lactating mother.

## Count V: Race Discrimination

118.    Plaintiff incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

119.    Plaintiff is a Black woman of Zimbabwean descent.

120.    Discrimination because of an employee's race is unlawful under Title VII, 42 U.S.C. § 2000e-1 *et seq.*

121.    Defendant qualifies as an employer under Title VII, and thus, Defendant has a legal obligation to provide Plaintiff and all employees a workplace free of unlawful discrimination and to investigate and then to remedy the situation if discrimination occurs.

122.    Defendant has a known history of granting preferential treatment to white men, and treating minorities worse.

123.   Defendant treated Plaintiff worse on account of her race, made comments about her race, and ultimately terminated her because of her race. Defendant's treatment of Plaintiff showed transparent bias against Plaintiff because she is a Black woman.

## RELIEF REQUESTED

124.   WHEREFORE, Ms. Maswoswe demands judgment against the Defendant and prays that the Court:

A.   A Declaratory judgment that Defendant's conduct violated her rights;

B.   Order Ms. Maswoswe' reinstatement to the position that she would have held absent the discrimination which she suffered, with full back pay and benefits;

C.   Award Ms. Maswoswe the maximum amount of non-pecuniary compensatory damages of $300,000;

D.   Award Ms. Maswoswe the out of pocket costs and consequential damages she incurred as a result of Defendant's discrimination against her;

E.   Award Ms. Maswoswe reasonable attorney's fees and the costs of this litigation, including the fees and costs incurred in the EEO administrative process;

F.   Award Ms. Maswoswe such front pay and future benefits as may be appropriate;

G.   Award Ms. Maswoswe the amount of loan repayment that Defendant would have provided to Ms. Maswoswe absent the discrimination that she suffered;

H.   Award Ms. Maswoswe appropriate prejudgment and post-judgment interest;

I.   Award Plaintiff an addition amount to account for any taxes she may be called upon to pay in relation to these awards herein;

J.   Enjoin the Defendant DOJ from discriminating against, retaliating against, or

harassing Ms. Maswoswe in any manner;

K.  Order Defendant DOJ to develop and implement effective measures to prevent and then remedy discrimination and retaliation;

L.  Order Defendant DOJ to develop and implement effective measures to ensure that pregnant and/or breastfeeding mothers are given appropriate accommodations and are not discriminated against or retaliated against;

M.  Order Defendant DOJ to consider appropriate disciplinary actions against the management officials who engaged in discrimination and/or retaliation against Plaintiff;

N.  Posting of notices on Defendant DOJ's premises notifying employees that Defendant has violated the anti-discrimination laws, and that employees who report future violations may not be subject to retaliation; and

O.  Award such other relief as may be necessary and proper.


### DEMAND FOR JURY TRIAL

125.    Plaintiff demands a jury trial as to all issues triable by a jury pursuant to Fed. R. Civ. P. 38.


Dated: February 16, 2021                    __/S/ JOSEPH D. GEBHARDT_____
                                                         Joseph D. Gebhardt
                                                         DC USDC No. 113894
                                                         *Of Counsel*
                                                         Gilbert Employment Law, P.C.
                                                         jgebhardt@gelawyer.com

                                                         __/S/ MICHAL SHINNAR_____
                                                         Michal Shinnar
                                                         DC USDC No. MD0033
                                                         *Senior Associate*
                                                         Gilbert Employment Law, P.C.
                                                         Mshinnar-efile@gelawyer.com

                                                         1100 Wayne Avenue, Suite 900 Silver
                                                         Spring, MD 20910

(301) 608-0880
(301) 608-0880 (fax)
*Attorneys for Plaintiff*